1
2
3
4
5
6
7
8
9

UNITED STATES  DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11
12

UNITED STATES OF AMERICA

13

                Plaintiff,

No. CR 04-00317 MHP

v.

14

CHARLES EDWARD LEPP,

15

            Defendant.

16
_____/

**MEMORANDUM & ORDER**
**Re: Motion to Admit Evidence from the**
**2004 Search; Motion to Suppress Fruits**
**of 2005 Search Warrant; Motion to**
**Suppress Evidence based on the Sixth**
**Amendment; Motion to Dismiss for**
**Outrageous Governmental Conduct;**
**and Motion to Reconsider RFRA Ruling**

17
18
19
20

      On August 17, 2004 a magistrate judge issued a warrant for the search of defendant Lepp's

21

properties ("2004 warrant").  As a result of evidence obtained during the August 18, 2004 search of

Lepp's properties ("2004 search"), Lepp was indicted.

22
23

      In January, 2005 the government conducted a sting operation through which they were able

to purchase one pound of marijuana from Lepp.

24
25

      On February 11, 2005 the government applied for and received another search warrant for

Lepp's properties ("2005 warrant").  Based on the fruits of a search executed on February 16, 2005

26

("2005 search"), Lepp was charged with four additional counts in a superceding indictment.

27
28

      On December 12, 2006 this court issued an order declaring the 2004 warrant defective and

suppressing all evidence obtained in the 2004 search.  See Docket No. 150.  The government now

moves for the admission of evidence found in plain view during the 2004 search.  Concurrently,

Lepp moves to: 1) suppress fruits of the 2005 warrant due to a lack of probable cause; 2) suppress

fruits of the 2005 warrant based on violations of the Sixth Amendment; 3) dismiss the distribution

count in the superceding indictment due to outrageous governmental conduct; and 4) reconsider one

of its earlier rulings.  Having considered the parties' arguments and for the reasons set forth below,

the court issues the following memorandum and order.

Motion to Admit Evidence Found in Plain View During the 2004 Search

I.      Background

On August 18, 2004 federal, state and local officers executed a warrant on four of Lepp's

properties in Upper Lake, California, seizing more than 32,000 marijuana plants and items related to

the packaging, processing and weighing of marijuana and hash.  Two of the properties

searched—941 East Highway 20 and 975 East State Highway 20—are adjoining rural premises on

the south side of East Highway 20 ("Rural Property").  Def.'s Evid. Exh. D.  The other two—9175

Upper Lake Lucerne Road and 9176 Upper Lake Lucerne Road—are adjoining residential premises

on the north side of Highway 20 ("Residential Property").  Id.  According to the government's

papers, officers found 24,784 marijuana plants on the Rural Property.  The remainder of the plants

were found on the Residential Property.

The Rural Property is a flat, rectangular field accessed by a private dirt road that intersects

with Highway 20.  Id., Exh. N.  The dirt road follows the rectangular boundary of the Rural

Property, allowing one to drive around the entire field.  Id.  A perimeter fence marks the outer edge

of the field, separating it from the dirt road and neighboring properties.  Id.  However, the fence

contains several large gaps, allowing vehicles to drive from the dirt road into and across the field.

Id., Exh. M.  At the time of the search, the field contained several thousand marijuana plants, the

largest of which were on the southern end of the field, farthest away from Highway 20.  Id.  The

marijuana plants closest to Highway 20 were on the northern end of the field and were smaller,

ranging from a few inches to a foot in height.  Id.  There were no permanent structures on the Rural

2

Property at the time of the search.  <u>Id.</u>

In contrast to the Rural Property, the Residential Property consists of hilly terrain and moderate-to-heavy vegetation cover.  <u>Id.</u>  The driveway leading to the Residential Property is accessed via Upper Lake Lucerne Road, which intersects with Highway 20 approximately 400 feet northwest of the Rural Property.  <u>Id.</u>, Exh. P.  A large locked gate featuring a "No Trespassing" sign blocks access to the driveway leading to the Residential Property.  Govt.'s Evid. Exh. 5.  At the time of the search, there were several permanent structures on the Residential Property, including Lepp's home.  <u>Id.</u>, Exh. 6.

On December 12, 2006 this court held that the 2004 search was based on a defective warrant and therefore suppressed all evidence found on both the Rural Property and Residential Property.  <u>See</u> Docket No. 150.  The government now moves for admission of evidence seized on the Rural Property by making two arguments in support: 1) marijuana growing on the northern end of the Rural Property was in plain view of officers standing on Highway 20; and 2) evidence seized from the Rural Property is admissible under the open fields doctrine.  Each argument is considered in turn below.

II.      <u>Legal Standard</u>

The Fourth Amendment protects citizens from unreasonable searches and seizures.  U.S. Const. amend. IV.  "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'"  <u>California v. Ciraolo</u>, 476 U.S. 207, 211 (1986) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  This requires "a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search?  Second, is society willing to recognize that expectation as reasonable?"  <u>Id.</u>  The plain view and open fields doctrines limit Fourth Amendment protections by narrowing the scope of objectively reasonable privacy interests.

3

## A.    Plain View Doctrine

Under the plain view doctrine, "[o]nce an officer has observed an object in 'plain view,' the owner's privacy interest in that object is lost." United States v. Bulacan, 156 F.3d 963, 968 (9th Cir. 1998). Thus, "when an obviously incriminating object is found in plain view, it may be seized without a warrant." Id. (citing Texas v. Brown, 460 U.S. 730, 739 (1983)). However, the plain view doctrine is subject to two important limitations. First, it is limited "to situations where the officer had a legal right to be at the location from which the object was plainly viewed." Id. (citing Horton v. California, 496 U.S. 128, 436 (1990)). Second, the seizure is not justified unless the officer had "a lawful right of access to the object itself." Horton, 496 U.S. at 136. Without a lawful right of access, "even where the object [in plain view] is contraband . . . the police may not enter and make a warrantless seizure." Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971).

## B.    Open Fields Doctrine

Under the open fields doctrine, "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." Oliver v. United States, 466 U.S. 170, 178 (1984). Thus, the zone of Fourth Amendment protection does not necessarily extend up to an individual's property boundary; only the curtilage—"the land immediately surrounding and associated with the home"—is shielded from unreasonable searches and seizures. Id. at 180 & n.11; see also United States v. Barajas-Avalos, 377 F.3d 1040, 1057 (9th Cir. 2004). What lies beyond the curtilage are open fields that are generally not within the zone of Fourth Amendment protection. Oliver, 466 U.S. at 179–80; Barajas-Avalos, 377 F.3d at 1056–57.

There is no fixed formula for distinguishing between curtilage and open fields. Nonetheless, in United States v. Dunn, 480 U.S. 294 (1987), the Supreme Court identified four factors that are relevant to this determination: (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." Id. at 301 (citations omitted).

Although the distinction between curtilage and open fields is useful under certain circumstances, it is not necessarily dispositive in determining whether an area is protected by the Fourth Amendment. The Supreme Court has made clear that what an individual "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Katz, 389 U.S. at 351. Thus, where an individual seeks to preserve an open field as private—for example, by erecting barriers and clearly marking the area as private—Fourth Amendment protections may apply, notwithstanding that the field is outside of the curtilage.[1] As such, the open fields analysis requires the court to ask two questions: (1) is the area in question within the protected curtilage?; and (2) has the individual implemented sufficient measures to preserve his or her field as private? If either of these questions is answered in the affirmative, Fourth Amendment protections apply.

III.   Discussion

A.   Plain View from the Highway

According to the government, the marijuana plants on the northern end of the Rural Property—approximately 25 to 200 yards from Highway 20 by varying accounts—were plainly visible to police officers before they initiated the search. Lepp disputes the government's argument, claiming it lacks credibility because no officer claimed to have seen marijuana from Highway 20 until after the court suppressed all evidence from the 2004 search.

Assuming arguendo that the officers did in fact see the marijuana from the Highway 20, the government must still prove that it had a lawful right of access to the object itself, namely access to the Rural Property. In order to make this showing, the government relies on the open fields doctrine. Since the marijuana plants on the Rural Property would obviously be in plain view if the government was legally on the Rural Property, the court focuses on that dispositive analysis below.

B.   Open Fields

Under the open fields doctrine, if Lepp did not have a reasonable expectation of privacy in his Rural Property, officers were entitled to trespass onto the Rural Property. To determine Lepp's

1    reasonable expectation of privacy, the court must assess not only whether the property was within

2    the curtilage as defined by Dunn, but also whether Lepp implemented measures to preserve the

3    property as private.

4        1.    Curtilage

5            a.    Proximity to the Dwelling

6        The first Dunn factor is the proximity to the dwelling of the area claimed to be curtilage.  480

7    U.S. at 301.  Application of this factor requires a case-by-case inquiry into the nature of the property

8    searched.  Johnson, 256 F.3d at 902.  While "there is not any fixed distance at which curtilage ends,"

9    United States v. Depew, 8 F.3d 1424, 1427 (9th Cir. 1993), as a general rule the extent of the

10   curtilage on rural properties will be greater than in a densely populated urban setting.  See Johnson,

11   256 F.3d 902.  Nonetheless, even in rural areas, it is rare for curtilage to extend more than 100 feet

12   beyond the home.  See, e.g., Dunn, 480 U.S. at 297, 302 (holding that deputies who approached

13   within 90 feet of a rural residence were not within the curtilage); United States v. Van Damme, 48

14   F.3d 461, 464 (9th Cir. 1995) (200 feet is outside the curtilage); United States v. Brady, 993 F.2d

15   177, 178 (9th Cir. 1993) (45 feet is outside the curtilage); United States v. Traynor, 990 F.2d 1153,

16   1158 (9th Cir. 1993) (overruled on other grounds in United States v. Johnson, 256 F.3d 895 (9th Cir.

17   2001)) (70 to 75 feet is outside the curtilage); United States v. Calabrese, 825 F.2d 1342, 1350 (9th

18   Cir. 1987) (50 feet is outside the curtilage).  But cf. United States v. Furrow, 229 F.3d 805, 817 (9th

19   Cir. 2000) (holding that the district court did not clearly err in finding a distance of 100 feet within

20   the curtilage); Depew, 8 F.3d at 1427 (distance of 50 to 60 feet is within the curtilage).

21       Here, although the exact distance between the Rural Property and Lepp's home is not clear,

22   the two are at least 250 feet from each other.  They also have different addresses and are located on

23   opposite sides of East Highway 20.  Lepp disputes the importance of this distance, contending that

24   because he can observe the Rural Property from his home, the property is within the curtilage.

25   Lepp's argument, however, misinterprets the curtilage analysis.  Lepp's ability to view the property

26   does not mitigate the fact that it is located a substantial distance from his home.  Furthermore, access

27   to the Rural Property from Lepp's home requires crossing a paved highway accessible to the public.

28

6

1    Thus, the first <u>Dunn</u> factor favors a finding that the Rural Property is outside the curtilage of Lepp's

2    home.

3                    b.      <u>Enclosures</u>

4          The second <u>Dunn</u> factor requires the court to consider whether the area searched is included

5    within any enclosure surrounding the home.  480 U.S. at 302.  As the Court observed in <u>Dunn</u>, the

6    boundaries of the curtilage will typically be "clearly marked" and "easily understood from our daily

7    experience."  480 U.S. at 302.  The most commonly encountered lines of demarcation are gates and

8    fences, which the Court characterized as "important factors in defining the curtilage."  <u>Id.</u> at 301 n.

9    4; <u>see also</u> <u>Johnson</u>, 256 F.3d at 902.  However, a "perimeter fence" will rarely be relevant in

10   determining the extent of the curtilage.  <u>See, e.g.</u>, <u>Traynor</u>, 990 F.2d at 1158; <u>see also</u> <u>United States</u>

11   <u>v. Van Damme</u>, 48 F.3d 461, 464 (9th 1995) (holding that a perimeter fence enclosing several acres,

12   including a home and a greenhouse, did not demarcate the curtilage boundary).

13         Here, the sole barrier enclosing the Rural Property, a wire fence, did not mark the boundary

14   of the curtilage.  It did not, for example, surround Lepp's home.  As stated above, the Rural Property

15   was across a publicly accessible road from Lepp's home.  Instead, the wire fence served as a

16   perimeter fence, marking the rectangular boundary of the field encompassed solely by the Rural

17   Property.  Moreover, because the fence was made of see-through wire and had several large gaps, it

18   did not block the public from observing or accessing the field.   Thus, this factor also indicates that

19   the Rural Property was not within the curtilage of Lepp's home.

20                   c.      <u>Uses of Area Searched</u>

21         The third <u>Dunn</u> factor is the nature of the uses being made of the searched area.  480 U.S. at

22   301.  In applying this factor, the court is mindful that the curtilage analysis is directed toward

23   determining "whether the area in question is so intimately tied to the home itself that it should be

24   placed under the home's 'umbrella' of Fourth Amendment protection."  <u>Id.</u>; <u>see also</u> <u>Depew</u>, 8 F.3d

25   at 1427 n.2.  This factor implies that a government agent must possess "prior objective knowledge of

26   the property's use" before traveling onto the land "free of Fourth Amendment constraints."  <u>Johnson</u>,

27   256 F.3d at 903 (citing <u>Depew</u>, 8 F.3d at 1426–27; <u>Calabrese</u>, 825 F.2d at 1350).

28

                                         7

Here, the Rural Property was not intimately tied to Lepp's home. Rather, the property served as a farm, and was located a substantial distance and across a state highway from Lepp's home. Moreover, before conducting the search, officers had received several tips that Lepp's property was being used to grow marijuana. Thus, this factor also indicates that the Rural Property was not within the curtilage of Lepp's home.

d. Steps Taken to Protect Area from Observation

The fourth and final <u>Dunn</u> factor requires the court to consider "the steps taken by the resident to protect the area from observation by people passing by." <u>Dunn</u>, 480 U.S. at 301. Here, Lepp did not take any discernable steps to protect the Rural Property from observation. The court is not aware of any "No Trespassing" signs posted on the property. Moreover, it appears that the private dirt road leading into the Rural Property was not blocked by a gate or a fence. Finally, although Lepp erected a perimeter fence, the fence was see-through and did not shield the property from public view or trespass. Thus, this factor also favors a finding that the Rural Property was not within the curtilage of Lepp's home.

In sum, having determined that each of the four <u>Dunn</u> factors weighs in favor of the government, the court finds that the Rural Property was not within the curtilage of Lepp's home.

2. Steps Taken to Preserve Area as Private

As discussed above, finding that an area is not part of the protected curtilage does not end the analysis. Where the owner has sought to preserve an area as private, it may be protected by the Fourth Amendment even if it is not within the curtilage of his home. The court has no trouble concluding that Lepp had a subjective expectation of privacy in the Rural Property. Indeed, the mere fact that Lepp challenges the search demonstrates that Lepp expected privacy. The issue before the court, then, is whether Lepp's expectation was one society is willing to recognize as reasonable.

Here, beyond erecting a perimeter fence, Lepp has taken no other steps to preserve the Rural Property as private. The perimeter fence surrounding the property does provide some measure of privacy, but the fence is see-through, allowing the public to observe the field. Moreover, there are

several large gaps in the fence which expose the field to public access. Thus, the court finds that Lepp did not have an objectively reasonable expectation of privacy in the Rural Property. Consequently, the government's motion to admit evidence seized on the Rural Property is granted.

Motion to Suppress Fruits of 2005 Search Warrant

I.    Background

On February 11, 2005 Magistrate Judge Maria Elena James issued a search warrant allowing for the search of premises described as "[s]ee Attachment I." Def's Evid. Exh. F. Attachment I particularly describes four pieces of property owned by Eddy Lepp. Id. Similarly, the concealed person or property to be searched was described as "[s]ee Attachment II," which particularly described the property to be seized. Id.

This warrant was based upon an application that attached an affidavit by Agent Burkhart. Id., Exh. E. The application for the search warrant also identifies the premises to be searched as "[s]ee Attachment I," which particularly identifies the premises to be searched. Id. The application left blank the section designated to identify the concealed person or property. The section on the warrant application describing facts demonstrating probable cause, however, incorporated the attached affidavits by reference, which requested a search warrant for the items described in Attachment II. Id., Burkhart Affidavit at 9.

Agent Burkhart's affidavit also presented the following in support of probable cause: 1) Lepp told Agent Macanga he would begin replanting marijuana immediately after the 2004 search; 2) aerial surveillance of property purportedly belonging to Lepp; 3) PG&E power usage records that indicated Lepp's power usage was 26 times the "baseline"; 4) a sign displaying a marijuana leaf and entwined snake on the fence surrounding Lepp's property; 5) the purchase of one pound of marijuana from Lepp; 6) previous 2002 search where three firearms, 9 kilograms of dried marijuana and 266 live marijuana plants were seized; and 7) previous 2004 search where a loaded firearm, 1.6 kilograms of marijuana and 32,524 live marijuana plants were seized. Id. at 3–5.

Lepp now makes four arguments to quash the 2005 warrant: 1) failure to use words of

9

incorporation in the warrant application; 2) inadequate words of incorporation on the warrant; 3) failure to provide Lepp with the warrant attachments at the time of search; and 4) a lack of probable cause. Each argument is discussed in turn.

II.    Legal Standard

A magistrate properly finds that probable cause exists when, "considering the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found." United States v. Reeves, 210 F.3d 1041, 1046 (9th Cir. 2000) (quotations omitted). In reviewing the issuance of a warrant, this court's duty "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238–39 (1983) (quotations omitted).

Additionally, a defendant may challenge a search conducted pursuant to a warrant on grounds that the warrant affidavit, while facially adequate to support a finding of probable cause, contained misstatements of fact or omissions which affected the issuing magistrate's determination. Franks v. Delaware, 438 U.S. 154 (1978). A warrant may also be held invalid where the affiant has "intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." United States v. Whitworth, 856 F.2d 1268, 1280 (9th Cir. 1988), cert. denied, 489 U.S. 1084 (1989) (internal quotation omitted). Under Franks, a defendant must satisfy a two-part showing in order for a court to find a search warrant invalid. First, the defendant must show that the affiant's statement or omission was either intentionally false or misleading or demonstrated reckless disregard of the truth. Franks, 438 U.S. at 155–56; United States v. Jordan, 291 F.3d 1091, 1100 (9th Cir. 2002). Next, defendant must show that the alleged falsehoods or omissions were necessary to the issuance of the warrant, such that without the misrepresentations, the affidavit would not support a finding of probable cause. Franks, 438 U.S. at 155–56; Jordan, 291 F.3d at 1100.

UNITED STATES DISTRICT COURT
For the Northern District of California

III.    <u>Discussion</u>

    A.    <u>Failure to Use Words of Incorporation in the Application for the 2005 Warrant</u>

Defendant correctly states that the application for the 2005 warrant did not specify the items to be searched on its face nor did it have any words of incorporation regarding the attachments. Defendant cites to multiple cases that hold warrant attachments valid only if the attachment physically accompanies the warrant and is incorporated by reference into the warrant. Defendant, however, cites to no cases creating a similar requirement with respect to *applications* for a warrant.

Defendant argues that without words of incorporation the magistrate issuing the warrant had no idea which items were to be searched. This argument fails because the warrant application incorporated the attached affidavits by reference, which in turn, requested a search warrant for the items described in Attachment II. Def's Evid. Exh. F, Burkhart Affidavit at 9. Attachment II then described with particularity which items were to be searched. This clarifies any confusion the magistrate may have had with respect to items that were to be searched. Indeed, the warrant the magistrate issued stated that the items to be searched were described in Attachment II. This Attachment II is identical to the Attachment II that accompanied the application for the warrant. <u>Compare</u> <u>id.</u>, Exh. E, Burkhart Affidavit at Attachment II <u>with</u> <u>id.</u>, Exh. F, Attachment II.

Furthermore, from a policy perspective, suppression is not the appropriate remedy. Suppression is primarily designed to deter. <u>See</u> <u>United States v. Calandra</u>, 414 U.S. 338, 348 (1974) ("the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."). Since a neutral and detached magistrate has no incentive to disregard Fourth Amendment rights, no deterrence purpose would be served by suppressing the fruits of the 2005 search due to the magistrate's purported error.

    B.    <u>Inadequate Words of Incorporation in the 2005 Warrant</u>

The Fourth Amendment requires that warrants describe with particularity the place and things to be seized. U. S. Const. amend. IV. The face of the warrant need not be particular so long

11

as a document describing with particularity is incorporated by "suitable words of reference" and accompanies the warrant. <u>United States v. Hillyard</u>, 677 F.2d 1336, 1340 (9th Cir. 1982).

Defendant argues that "See Attachment I" and "See Attachment II" are inadequate words of incorporation. These words, he argues, do not constitute words that sufficiently identify and incorporate the relevant information. The adequacy of words of incorporation is a case-by-case analysis and this court refuses to create a rule whereby magic words of incorporation are necessary. "See" refers the reader of the warrant elsewhere for the pertinent information. The descriptor "Attachment I" or "Attachment II" refers the reader to the specific document that contains the pertinent information. The specificity with which the attachments are numbered make it effortless for a reader to sufficiently identify and incorporate the relevant information. Thus, this court holds as a matter of law that the words of incorporation here were adequate.

Defendant argues that the government should have summarized, on the face of the warrant, the description of the place to be searched and the property to be seized. He does not cite to any authority in this respect. The constitutional particularity requirement, however, suggests that a summary, by itself, may *sometimes* be inadequate. Since the government is required to describe the place and property with particularity, the court finds no benefit in summarizing the information and placing the same on the face of the warrant. This redundancy is a waste of governmental resources in light of the fact that the attachments must be provided to the defendant upon execution of the warrant.

The court now turns to Lepp's contention that he was not provided these attachments when his property was searched.

C.      Failure to Provide Lepp with the Warrant Attachments at the time of Search

"The officer executing the search warrant must: (A) give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken . . . ." Fed. R. Crim. P. 41(f)(3). Lepp attests he was not presented with the attachments that accompanied the search warrant when the 2005 search of his property was conducted. Def's Motion

to Suppress Fruits of 2004 and 2005 Search Warrants, Exh. F (affidavits of Lepp and his wife attesting that they were not presented with the attachments and that the same arrived in the mail a week later). The government alleges in its papers that it allowed the defendant to read the warrant and attachments before the search was executed and promises to refute this testimony during the evidentiary hearing. The government, however, presented no evidence to this effect during the evidentiary hearing.

Based on this alleged factual dispute, Lepp argues that the fruits of the 2005 search should be suppressed.[2] In the Ninth Circuit, "if a person is present at the search of her premises, Rule 41(d) requires officers to give her a complete copy of the warrant at the outset of the search." United States v. Gantt, 194 F.3d 987, 994, 1004 (9th Cir. 1999). In Gantt, the court considered suppression to be an appropriate remedy because the government conceded that it had not provided defendant with the warrant attachments at the outset of the search and provided no explanation for the same. Id. at 994–95. The court further stated that "[v]iolations of Rule 41 do not usually demand suppression, however. Under Ninth Circuit law, 'technical' violations of Rule 41(d) require suppression only if there was a deliberate disregard of the rule or if the defendant was prejudiced." Id. at 994 (internal quotation omitted).

More recently, the Ninth Circuit has clarified the standard to state: "There are three circumstances under which evidence obtained in violation of Federal Rule of Criminal Procedure 41 requires suppression:

> 1) the violation rises to a 'constitutional magnitude;' 2) the defendant was prejudiced, in the sense that the search would not have occurred or would not have been so abrasive if law enforcement had followed the Rule; or 3) officers acted in 'intentional and deliberate disregard' of a provision in the Rule.

United States v. Williamson, 439 F.3d 1125, 1133 (9th Cir. 2006) (internal citations omitted). The court discusses each in turn.

Defendant does not contend that the violation rises to a "constitutional magnitude." The error, therefore, is a "mere technical error," and suppression is only appropriate if defendant suffered prejudice or if the violation was deliberate. See id.

"'Prejudice' means that the 'the search would not have occurred or would not have been so

13

abrasive if law enforcement had followed the Rule.'" Id. (quoting United States v. Martinez-Garcia, 397 F.3d 1205, 1213 (9th Cir. 2005). Lepp does not contend that no search would have occurred or that the search would have been less abrasive had the government followed Rule 41(d).

Lepp does, however, argue that the agents acted with "intentional and deliberate disregard" of Rule 41(d) and suppression is therefore necessary. Nevertheless, he failed to present any supporting evidence at the evidentiary hearing. The case at bar is unlike Gantt since the government does not concede it neglected to provide Lepp the attachments before the search was conducted. Even if the agents did not provide Lepp with the attachments before the search, he has made no showing that the agents acted with intentional and deliberate disregard of the law. Thus, Lepp's motion to quash the 2005 warrant on this basis is denied.

### D.     Lack of Probable Cause

As stated above, agent Burkhart's affidavit presents the following in support of probable cause: 1) Lepp told Agent Macanga he would begin replanting marijuana immediately after the 2004 search; 2) aerial surveillance of property purportedly belonging to Lepp; 3) PG&E power usage records that indicated Lepp's power usage was 26 times the "baseline"; 4) a new sign of a marijuana leaf and entwined snake on the fence surrounding Lepp's property; 5) the purchase of one pound of marijuana from Lepp; 6) previous 2002 search where three firearms, 9 kilograms of dried marijuana and 266 live marijuana plants were seized; and 7) previous 2004 search where a loaded firearm, 1.6 kilograms of marijuana and 32,524 live marijuana plants were seized.

As stated above, the court limits reason seven to only the 24,784 plants located on the Rural Property. Nevertheless, the court does not attribute any weight to the prior offenses, reasons six and seven, since they are not indicative of a current offense and condone a finding of probable cause based on Lepp's status as a prior offender. Thus, the court is left with reasons one through five above.

Reason number one must be struck from the affidavit. This court has held the 2004 warrant defective and therefore any fruits from that search are inadmissible. In light of the government's

1 | plain view and open fields argument, some of the evidence seized during that search is indeed
2 | admissible. Nevertheless, other fruits of that illegal search are still inadmissible, including Lepp's
3 | purported statement that he intended to replant marijuana immediately after the 2004 search and
4 | expected to have marijuana plants in active cultivation within a week. Def's Evid. Exh. E, Affidavit
5 | of Brandon Burkhart at ¶ 8. Furthermore, the government has not made any showing as to the
6 | circumstances surrounding the statements made by Lepp. It is unclear whether the statements were
7 | made on the Residential Property or the Rural Property or after arrest. Thus, Lepp's statements
8 | cannot form any part of the basis for probable cause.

9 | Reason number two has been heavily contested by the parties. The affiant, when applying
10 | for the search warrant, claimed he "observed what appeared to be several rows of large marijuana
11 | plants growing in a small field on the adjoining parcels located at 9175 and 9176 Upper lake-
12 | Lucerne Road, Upper Lake, CA, and sitting adjacent to the primary residence." Id., ¶ 9. The
13 | government attached two pictures to the affidavit. A review by this court of the pictures does not
14 | provide any probable cause for a search. The poor quality of the pictures would not allow the
15 | magistrate to discern whether the plants depicted are marijuana or not. Therefore, the only relevant
16 | piece of evidence in paragraph nine is the affiant's characterization of the plants as marijuana.

17 | The defense makes much of the fact that the affiant, who conducted the aerial surveillance,
18 | does not aver that there are any structures on Lepp's property where marijuana could be cultivated
19 | indoors. The only structures depicted in the pictures, they claim, are not located on Lepp's property.
20 | Assuming that the defense is right, evidence of structures on the land where indoor grow can occur
21 | is not necessary to a finding of probable cause if the affiant testifies he saw marijuana growing
22 | outdoors. This, of course, assumes the affiant was in fact looking at the defendant's land.[3] In light
23 | of the poor quality of the pictures provided, however, the only evidence relevant to probable cause
24 | here is affiant's conclusory identification of marijuana plants purportedly growing outdoors on
25 | Lepp's property. It is notable that the affiant does not state any details about the plants or his
26 | vantage point.

27 | Reason number three is arguably misleading. The government neglected to inform the
28 |

15

magistrate that the "baseline" used was for residential properties, not quasi-commercial or farming property. This information could negate the negative inference sought because the electricity could have been used to by irrigation systems to water whatever Lepp was growing on his farmland. However, the court will not excise this portion of the affidavit since there was a physical brick-and-mortar residence on the properties to be searched. In light of the residence's existence, the court does not find the affiant's omission demonstrates reckless disregard of the truth.[4] Indeed, the affidavit specifies that 9175 Upper Lake Lucerne Road incorporates residential premises. Id., ¶ 7. This also makes irrelevant the failure of the aerial surveillance to identify structures where indoor grow could occur. Nevertheless, the court is concerned about the probative value of high energy use without any supporting facts other than that Lepp maintained his residence there. In sum, since the high energy use could be for illegal indoor grow or legal outdoor farming uses, its probative value with respect to indoor grow is quite limited.

Reason number four must be struck from the affidavit. A sign with a marijuana leaf with an intertwined snake is of no consequence without further evidence. The government did not present any evidence that this combination image is used by marijuana growers or dealers. The affidavit simply states: "The sign bore a large marijuana leaf and entwined snake and textually confirmed that the property was designated for marijuana production." Id., ¶ 12. This textual confirmation could be construed in multiple ways. For instance, it could be the affiant's subjective views about the sign or, conversely, it could be the affiant paraphrasing words associated with the sign which stated that marijuana production occurred at the premises. Without a more detailed description of the sign or an explanation as to what the affiant meant by his statement, this court cannot assign to a benign and legal image support for a finding of probable cause.

Finally, based on the rationale given below, reason number five—that Lepp recently sold one pound of marijuana to an undercover agent—was properly averred in the affidavit for a search warrant. However, the affiant gave only meager evidence in support of probable cause for a search of Lepp's home and property. The affidavit states that Lepp returned to his residence to procure one pound of marijuana; however, the affidavit contains no indication as to the basis for the affiant's

knowledge. Indeed, as explained in the background section below, since only the CI accompanied Lepp to procure the marijuana, it is unclear whether Lepp even returned to his home. Consequently, reason number five provides little support in a finding of probable cause for the search of Lepp's home and property.

In light of the above discussion, the court is left with: 1) the affiant's statement that he saw what appeared to be marijuana on property that supposedly belonged to Lepp; 2) Lepp's electricity usage was many times the PG&E baseline; and 3) Lepp allegedly returned to his home to procure the marijuana he sold to an undercover agent. The affiant's conclusory statement about outdoor marijuana cultivation is not accompanied by any statements regarding his aerial surveillance experience or any details regarding the plants—for example, how tall they were, how many there were and how far away they were from the airplane. This is not enough to find probable cause based on a potential outdoor grow. Similarly, the affiant's desired inference of indoor grow cannot be drawn from the electricity bills because the electricity use could have been for irrigation systems or other farm equipment used on Lepp's property. Indeed, the electricity could have been used to grow the outdoor plants—unidentifiable by the pictures provided to the court—that the affiant saw growing on Lepp's property. Independent of the same, high electricity use, without more, does not provide probable cause for a search. Finally, since there is no indication in the warrant affidavit that Lepp actually returned to his home to procure marijuana that he provided to the undercover agent, the court is unable to find probable cause supporting the issuance of the 2005 search warrant. Consequently, the 2005 search warrant is quashed and defendant's motion to suppress fruits of the 2005 search warrant is granted.

Motion to Suppress Evidence based on the Sixth Amendment

I.      Background

On September 28, 2004 Lepp was indicted on narcotics charges. The charges stemmed from a search of his property on August 18, 2004, which led to the seizure of thousands of plants of marijuana. On January 19, 2005 the government was successful in getting Lepp to sell an

1   undercover agent one pound of marijuana.  The specifics of this transaction, as illuminated during

2   the evidentiary hearings held on January 16, 2008 and January 23, 2008, are set forth below.

3        In early October 2004 a confidential informant ("CI") who had worked with the Drug

4   Enforcement Agency ("DEA") on several occasions since 2001 noticed an advertisement by Lepp in

5   the *Penny Slaver* magazine.  The advertisement requested pictures of the August 2004 raid by DEA

6   agents of Lepp's property.  The CI had, in the past, overheard Lepp brag about cultivating

7   marijuana.  He also admitted to multiple people that he has felt animosity toward Lepp.

8        The CI then, of his own volition, hatched a plan whereby he would establish a rapport with

9   Lepp by giving him government pictures of the raid.  He wanted to dragoon Lepp into the

10  government's net by purchasing marijuana from him after establishing a rapport.  The CI relayed

11  this plan to Deputy Sergeant McMahon with the Lake County Sheriff's Department, who then gave

12  the CI an internet link to "trophy pictures"—pictures taken by individual police officers independent

13  of the investigation—of the raid that were on the Sheriff Department's website.[5]  These were the

14  only pictures given to the CI.  Without telling the CI about the pending charges against Lepp,

15  McMahon put the CI in touch with Mark Macanga, a special agent with the DEA.  Macanga was the

16  case agent during the 2004 search and knew of the pending charges against Lepp.  After consultation

17  with the United States Attorney's office, Macanga endorsed the plan, but neglected to instruct the CI

18  not to elicit information regarding the pending charges.  Macanga claims he did not intend to have

19  the CI and the undercover agent talk about the 2004 charges even though he adopted the CI's idea to

20  use pictures of the 2004 search as the ruse to entice Lepp.  He claims it did not occur to him that

21  Lepp would want to talk about the pictures.

22       The CI then contacted Lepp and offered Lepp the pictures he received from McMahon.  Lepp

23  agreed.  As planned, during their first meeting, the CI told Lepp he found the pictures in a DEA

24  aircraft during his capacity as an upholstery worker.  He then gave Lepp two pictures and brought up

25  the idea of acquiring marijuana from Lepp.  Lepp stated that would not be a problem.  Thereafter,

26  the CI met with Lepp three to four times and gave him two to three pictures each time.  During each

27  meeting, the CI told Lepp that one of his friends wanted marijuana.  Lepp did not pay the CI any

28

money for these pictures, but Lepp did state that if the pictures were useful, he would name a strain of marijuana after the CI.

On the day of the sale, Lepp agreed to sell the CI one pound of marijuana.  At the transaction location, the CI introduced Lepp to his friend, an undercover DEA agent.  This undercover agent knew that pictures of the 2004 search had been used as a hook to establish a rapport with Lepp.  The undercover agent also knew of the DEA's pending case against Lepp.  The discussion that ensued between the undercover agent and Lepp was recorded and later transcribed.  See Def.'s Motion to Dismiss for Outrageous Governmental Conduct, Exh. A.

During the discussion, the undercover agent asked Lepp if he received the pictures from the 2004 raid.  He also informed Lepp that he had about fifty pictures of the raid.  He then asked whether the pictures would help Lepp, to which Lepp replied in the negative.  The undercover agent than stated he had audio recordings of the search in the form of "DEA radio frequencies" that he could provide Lepp if he received assurances from Lepp that his identity would remain confidential.  In exchange, he said he wasn't "looking to get . . . rich" but was "looking to get a good deal on an elbow [one pound of marijuana]."  Lepp then stated he had helped 16% of California's medical marijuana patients acquire marijuana and assured the undercover agent that his identity would remain confidential by stating that even though federal agents had been to his place twice, they had nevertheless been unable to determine the identities of his customers.  Id.

The undercover agent asked why the DEA was at Lepp's house and also inquired about Lepp's court date.  The agent then inquired about acquiring marijuana.  He asked what Lepp had on hand, to which Lepp replied that he had nothing, and that he was merely a middle-man.  The undercover agent then asked Lepp if the federal agents took everything at the bust, to which Lepp replied in the affirmative.  Nevertheless, Lepp did provide the undercover agent with a sample of the marijuana that the undercover agent could purchase from Lepp.  Id.

Lepp then offered to sell the undercover agent a pound of marijuana for $2,500.  Lepp stated that in another month he would have marijuana for sale in the $3,500 to $4,000 range for which people in Los Angeles were paying $4,800.  After the decision to purchase one pound of marijuana

19

had been made, Lepp and the CI went to Lepp's house to acquire the marijuana and the agent stayed at the transaction location. After the CI declined to deliver the marijuana to the undercover DEA agent, Lepp remained behind and instructed someone named Jason to drive the CI to the transaction location. At this site, Jason dropped off the CI and delivered the marijuana to the undercover agent, who paid Jason. Id.

After the transaction, Macanga wrote a "purchase report" memorializing the incident. This report was based on: 1) the conversation between the undercover agent and Lepp; 2) an interview with the CI; 3) an interview with the undercover agent; and 4) Macanga's knowledge of the events. Even though Macanga knew the report would be relied upon by other DEA agents, it contains numerous errors and omissions. For instance, it states that Lepp admitted he was responsible for one-fourth of California's medical marijuana when in fact Lepp had stated he had helped one-fourth of all the medical marijuana patients in California. More importantly, the report failed to mention the following: 1) the DEA used photos from the 2004 search and promises of audio recordings from the search to establish a relationship with Lepp; 2) the undercover agent was the one that initiated conversation about purchasing marijuana; and 3) Lepp mentioned not having any marijuana and being a mere middleman. Finally, the report mischaracterizes the following: 1) Lepp had indicated he would keep the undercover agent's identity confidential with respect to the DEA recordings, not the marijuana purchase; and 2) Lepp had indicated the marijuana he would have in the future goes for $4,800 in Los Angeles, not that the undercover agent could sell this marijuana for $4,800 in Los Angeles.

II.     Legal Standard

The government violates a criminal defendant's Sixth Amendment right to counsel when it deliberately elicits incriminating information from an indicted defendant who was entitled to the assistance of counsel. Massiah v. United States, 377 U.S. 201 (1964). The Supreme Court has interpreted Massiah as holding that a Sixth Amendment violation occurs when the government "intentionally creat[es] a situation likely to induce [the defendant] to make incriminating statements

without the assistance of counsel." <u>United States v. Henry</u>, 447 U.S. 264, 274 (1980). The determinative issue is "not the informant's subjective intentions, but rather whether the federal law enforcement officials created a situation which would likely cause the defendant to make incriminating statements." <u>United States v. Harris</u>, 738 F.2d 1068, 1071 (9th Cir. 1984).

The <u>Massiah</u> doctrine has two elements relevant to the present action: there must be (1) an "agency" relationship between the government and the informant, and (2) some quantum of knowledge on the government's part that its agent was likely to obtain incriminating statements from the accused. <u>Maine v. Moulton</u>, 474 U.S. 159, 176 (1985).

The appropriate remedy for a violation of <u>Massiah</u> includes "not only suppression of all evidence directly obtained through governmental misconduct, but also suppression of all evidence that can properly be designated the fruits of that conduct." <u>United States v. Kimball</u>, 884 F.2d 1274, 1278–79 (9th Cir. 1989). The <u>Massiah</u> rule, however, has been abrogated to permit the government to continue investigation of the suspected criminal activities of a defendant even though the defendant has already been indicted. This is because "[t]he police have an interest . . . in investigating new or additional crimes [post-indictment] . . . [T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities . . . ." <u>Moulton</u>, 474 U.S. at 179–80. Thus, "<u>Massiah</u> offers no immunity from liability for uncounseled, post-indictment statements that involve(d) criminal acts or constituted criminal acts in themselves." <u>United States v. Moschiano</u>, 695 F.2d 236, 240 (7th Cir.1982) <u>cert. denied</u>, 464 U.S. 831 (1983).

III.     <u>Discussion</u>

It is uncontested that Lepp had been indicted when the sting operation took place. It is further uncontested that Lepp was represented by counsel at the time. The court now turns to whether individuals with an agency relationship to the government were involved and whether incriminating statements were likely to be elicited.

First, the confidential informant and the undercover agent were both working in conjunction with the DEA. The confidential informant stood to gain financially if he was able to entice Lepp into the sale. The undercover agent was on the DEA payroll. There can be no argument that these two individuals had an agency relationship with the government. See United States v. Brink, 39 F.3d 419, 423 (3rd Cir. 1994) (stating that an informant is one who is offered money, benefits, preferential treatment, or some future consideration, including, but not limited to, a reduction in sentence, in exchange for eliciting information is a paid informant).

Second, the ruse created by the confidential informant was premised upon evidence of charges for which Lepp had already been indicted. The rapport the informant hoped to create was via the use of material that Lepp had not yet received from the government in his pending case. This rapport would have to be premised on discussions about the pictures. Thus, undoubtedly in this situation, the DEA intentionally created a situation likely to induce Lepp to make incriminating statements without the assistance of counsel. Specifically, the facts here are very similar to Massiah, where a co-defendant invited defendant Massiah to discuss the pending case with him in his car, which had a radio transmitter under the front seat. An agent equipped with a recording device was parked near the co-defendant's car and overheard the transmitted, incriminating conversations. Here, the undercover agent explicitly invited Lepp to discuss the pending case with him while the conversation was being recorded. Indeed, the undercover agent asked, with respect to the 2004 search, "[w]hy are they fucking with you?" and "[w]hen do you go to court?" Def's Motion to Suppress based on Sixth Amendment, Exh. A at 3–4.

Based on the above, all evidence garnered from the 2005 sting operation, as well as all evidence that can be designated fruits of that conduct, may not be introduced with respect to the charges against Lepp at the time of the sting operation. Nevertheless, since "Massiah offers no immunity from liability for uncounseled, post-indictment statements that involve(d) criminal acts or constituted criminal acts in themselves," Moschiano, 695 F.2d at 240, the evidence may be introduced with respect to the newly added distribution charge in the superceding 2005 indictment. However, since the evidence in the pre-sting and sting counts is intertwined, the court orders the

22

counts arising from the sting operation in the 2005 indictment be severed.

Motion to Dismiss for Outrageous Governmental Conduct

I.     Background

See Background section supra under the heading, "Motion to Suppress Evidence based on the Sixth Amendment."

II.    Legal Standard

The outrageous governmental conduct defense stems from dicta in United States v. Russell, 411 U.S. 423, 431–32 (1973), which noted that the Court might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  No bright-line rules have been established to determine what type of activity qualifies as outrageous.  United States v. Bogart, 783 F.2d 1428, 1438 (9th Cir. 1986).

Prosecution of an offense may be barred when the government's conduct in the investigation is so grossly shocking as to violate the universal sense of justice.  United States v. Garza-Juarez, 992 F.2d 896, 904 (9th Cir. 1993); see also United States v. Gurolla, 333 F.3d 944, 950 (9th Cir. 2003). The government's conduct warrants dismissal of the indictment only if "that conduct is so excessive, flagrant, scandalous, intolerable and offensive as to violate due process."  Garza-Juarez, 992 F.2d at 904.  The focus here is on the "behavior of investigators. This conduct is considered without reference to any predisposition on the defendant's part."  Id. at 903.

This high standard requiring dismissal is met where undercover government agents "engineer and direct the criminal enterprise from start to finish," thereby "[generating] . . . new crimes merely for the sake of pressing criminal charges against the defendant."  United States v. Ramirez, 710 F.2d 535, 539–40 (9th Cir. 1983); see also Gurolla, 333 F.3d at 950; Bogart, 783 F.2d at 1436.  The standard is also met "where the police conduct involved unwarranted physical, or perhaps mental, coercion," Bogart, 783 F.3d at 1438, or when "the government operates, for an extended period of

time, an actual and illegal apparatus." <u>Garza-Juarez</u>, 992 F.2d at 904 (internal quotations omitted).

Courts have interpreted this standard narrowly, dismissing indictments only in cases of egregious conduct. <u>Compare Greene v. United States</u>, 454 F.2d 783 (9th Cir.1971) (reversing convictions where government undercover agents established illegal bootlegging operation, provided substantial equipment and supplies, ran it for two-and-a-half years and was its sole customer); <u>with United States v. Smith</u>, 924 F.2d 889 (9th Cir. 1991) (holding that government agents acted permissibly when encouraging 18-year-old in drug treatment center to deal drugs); <u>United States v. Simpson</u>, 813 F.2d 1462 (9th Cir. 1987) (finding no outrageous conduct where FBI used government informant while knowing she had initiated sexual relationship to gain defendant's confidences); <u>Ramirez</u>, 710 F.2d 535 (upholding convictions for drug activity in which police had encouraged defendant to participate as an informant).

In <u>United States v. Lomas</u>, 706 F.2d 886, 890–91 (9th Cir. 1983), <u>overruled on other grounds by Segura v. United States</u>, 468 U.S. 796, 814 n. 9 (1984), <u>as recognized in United States v. Merriweather</u>, 777 F.2d 503, 506 (9th Cir. 1985), the Ninth Circuit held that in the course of an undercover narcotics investigation, an agent may provide something of value to a criminal enterprise to gain the confidence of those involved in illicit activity. In <u>United States v. Wiley</u>, 794 F.2d 514, 516 (9th Cir. 1986), this Circuit held that providing drugs for the transaction did not constitute outrageous government misconduct. In <u>Wiley</u>, the government used an informant and an FBI agent posing as a courier to infiltrate a prison drug smuggling operation. The Ninth Circuit found that the smuggling network was already in place and the government merely activated it to find the route and couriers. It explained, "[T]he government merely provided an impetus to [the defendants, and] . . . [u]nder these circumstances, providing the drugs for the transaction did not constitute government misconduct." <u>Id.</u>

This "standard is not met when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture." <u>Gurolla</u>, 333 F.3d at 950. For instance, the defense is "generally unavailable where the criminal enterprise was already in progress before

the government became involved or where the defendant was involved in a continuing series of similar crimes during the government conduct at issue." United States v. Stenberg, 803 F.2d 422, 429 (9th Cir. 1986).

Finally, "[a] court may exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of a due process violation." United States v. Ross, 372 F.3d 1097, 1109 (9th Cir. 2004). The prosecutorial misconduct must: "(1) be flagrant and (2) cause 'substantial prejudice' to the defendant." Id. at 1110 (citation omitted).

III.    Discussion

Lepp claims that this court should dismiss charges stemming from the sting operation because the government exploited his vulnerabilities by providing him pictures depicting the execution of the 2004 warrant. However, Lepp invited evidence of the execution of the 2004 warrant through his advertisement in a public and freely distributed local paper, the *Penny Slaver*. Thus, the court does not find that the government targeted Lepp's physical or mental shortcomings. Second, Lepp's argument that the government may never communicate with a represented defendant without the consent of that defendant's lawyers goes against established case law that allows communication with respect to unindicted crimes but not indicted crimes. See Moulton, 474 U.S. at 179–80. The proper remedy for contact with respect to indicted crimes is suppression, and that remedy has already been utilized.

This court agrees with the Ninth Circuit's holding that "[i]n the course of an undercover narcotics investigation, an agent may provide something of value to a criminal enterprise to gain the confidence of those involved in illicit activity." Lomas, 706 F.2d at 890–91. However, the Ninth Circuit has not articulated a clear standard as to what types of items the government may lawfully provide. Thus, this court must determine whether the government's conduct was outrageous based on the general standard and pronouncements set forth by governing case law. It is worth noting that the Lomas standard does not give the government *carte blanche* regarding what items of value may be provided to gain the confidences of those involved in illicit activity.

1   It is undisputed that the government used material from an offense for which Lepp had been

2   indicted in order to lure him into selling marijuana to the undercover agent. Lepp, who had solicited

3   exculpatory material through his *Penny Slaver* advertisement, was given the impression that the CI

4   and the undercover agent had exculpatory material. Indeed, the undercover agent specifically asked

5   Lepp about the usefulness of the material to Lepp's pending criminal case. When Lepp replied that

6   the pictures provided thus far were likely not very useful, the agent stated he also had police audio

7   recordings of the search that he may be able to provide Lepp. In exchange, the agent wanted a good

8   deal on a pound of marijuana.

9   Here, Lepp was given materials he himself sought. From his first meeting with the CI, Lepp

10  consistently stated that he could provide marijuana to the CI. At the time of the sale, Lepp was

11  engaged in criminal activity and intended to have more marijuana for sale within a month. Further,

12  even though he contended he had no marijuana, he was able to provide the undercover agent a

13  sample of the marijuana. None of this creates an inference that the government directed the criminal

14  enterprise from start to finish, nor does it demonstrate unwarranted physical or mental coercion.

15  Indeed, the government "merely infiltrate[d] an existing organization, approach[ing] persons it

16  believe[d] to be already engaged in or planning to participate in the [criminal act]." Gurolla, 333

17  F.3d at 950; see also Stenberg, 803 F.2d at 429.

18  The defense argues that an implicit quid pro quo was formed between the government and

19  Lepp whereby Lepp was to provide marijuana in exchange for the purportedly exculpatory material.

20  The undercover agent's statements that he was merely looking to secure an "elbow" for a good price

21  is certainly evidence of this. Nevertheless, there has been no showing that the nature of the material

22  used is what makes the government's conduct outrageous. For instance, the undercover agent did

23  not represent to Lepp that any of the information he could provide would in fact be exculpatory.

24  Neither was an overt quid pro quo agreement made between the undercover agent and Lepp. Indeed,

25  there is no showing that Lepp gave the undercover agent a discount on the marijuana.

26  Furthermore, the defense has not demonstrated that the government was required to provide

27  this material under the standard set forth in Brady v. Maryland, 373 U.S. 83 (1963). Indeed, Lepp

28

26

stated the pictures were not very helpful to his case. Thus, the court is unclear as to what effect, if any, the quid pro quo agreement has upon the analysis. Under Lomas, the government may provide things of value to gain the confidences of the purported criminal. There is a limit as to what the government may provide; however, that limit has not been reached here. In spite of this holding, outrageous governmental conduct may exist where Brady material is used to entice a criminal defendant who did not solicit the exculpatory material.

The defense makes much of the prejudice suffered by Lepp by arguing that the government's actions impinge upon Lepp's Fifth Amendment right against self-incrimination. The sting operation demonstrates Lepp was not using marijuana purely for religious purposes—one of his defenses at trial. It also impugns the credibility of his character. These arguments, however, merely state the consequences of Lepp's illegal activities. Indeed, Lepp will likely also be prejudiced by the sentence he receives if he is convicted. The fact that Lepp will suffer prejudice due to his own criminal activities that were not coerced or directed by the government does not amount to outrageous governmental conduct.

Motion to Reconsider RFRA ruling

I.      Background

On November 6, 2006 defendant Eddy Lepp filed a motion to suppress evidence obtained from the two searches because the warrants allegedly violated the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. section 2000bb et seq. See Docket No. 139. On September 7, 2007 the court issued an order denying the motion to suppress on RFRA grounds. See Docket No. 193. In that order, the court quoted Bryant v. Gomez, 46 F.3d 948 (9th Cir. 1994), which stated that a burden upon religious freedom must be "more than an inconvenience . . . [it] must be substantial and an interference with a tent or belief that is central to religious doctrine." Id. at 4 (internal quotations omitted). On December 3, 2007 defendant filed a motion urging the court to reconsider its decision because the standard cited above is incorrect.

II.    Legal Standard

The RFRA prohibits the government from "substantially burdening a person's exercise of religion even if the burden results from a rule of generally applicability." 42 U.S.C. § 20000bb-1. The "exercise of religion" was re-defined in 2000 to protect "any exercise of religion, whether or not compelled by or central to, a system of belief." Id. §§ 2000bb-2(4), 2000cc5(7)(A).[6]

III.    Discussion

Under the 2000 amendments, interference with a central tenet or belief is no longer required by the RFRA. Defendant argues that since the court quoted and applied an outdated standard, it should reconsider its decision.

Defendant's argument does not question the findings upon which the court premised its holding. Specifically, the court found that the government's actions did not substantially burden Lepp's exercise of freedom. Though the court cited the language in Bryant v. Gomez, it did not base its decision upon the centrality of Lepp's belief to the religious doctrine. Indeed, the court stated that "[f]or the purposes of this motion, the court considers Lepp's espoused religious beliefs as genuine and his claimed religion to be one within the meaning of RFRA." See Docket No. 193 at 3. The court went on to hold that the government's actions did not substantially burden Lepp's exercise of religious freedom. Id. at 4–5.

Since the court's analysis regarding substantiality remains unchanged, any reconsideration of the RFRA motion must fail. This is because under the RFRA, any burden must not only affect the exercise of religion, but substantially affect the same. To the extent that the court referenced a standard that is no longer applicable and which the court did not employ, the court's earlier order is modified to remove reference to such standards.

CONCLUSION

Based on the foregoing, the government's Motion to Admit Evidence from the 2004 Search is GRANTED; the defendant's Motion to Suppress Fruits of 2005 Search Warrant is GRANTED;

the defendant's Motion to Suppress Evidence based on the Sixth Amendment is GRANTED; the defendant's Motion to Dismiss for Outrageous Governmental Conduct is DENIED; and the defendant's Motion to Reconsider the RFRA Ruling is DENIED.

In light of the court's order, the only charges remaining against Lepp are charges stemming from: 1) the 24,784 marijuana plants found on Lepp's Rural Property during the 2004 search; and 2) Lepp's sale of one pound of marijuana to an undercover agent in early 2005. Due to Sixth Amendment violations, the charges with respect to the outdoor grow are to be severed and tried separately from the charges with respect to the sale.

IT IS SO ORDERED.

Dated: March 6, 2008

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1.      Although this inquiry and the fourth <u>Dunn</u> factor involve similar considerations, the two are not the same.  Unlike the fourth <u>Dunn</u> factor, this inquiry is not restricted by the concept of curtilage.  Rather, it focuses solely on whether the individual has implemented measures to preserve his or her land as private.  Under certain circumstances, an area may fall outside the curtilage but still have Fourth Amendment protection.

2.      Lepp argues the same with respect to the 2004 search; however, this court has already quashed the 2004 warrant.  <u>See</u> Docket No. 150.

3.      There is also substantial confusion as to whether the plants depicted in the pictures were actually on Lepp's property.  Resolution of this issue, however, is irrelevant since the nature of the plants cannot be determined through an examination of the pictures provided to the magistrate.

4.      There has been no evidence presented that the statements made were intentionally false or misleading.

5.      There is a question of fact as to whether McMahon sent the pictures to the CI of his own volition before the CI saw the advertizement in the *Penny Slaver* or whether he sent the pictures upon the CI's request.  This requires the court to assess the witness' credibility.  The CI was motivated by the financial reward awaiting him if he was able to get Lepp to sell marijuana to an undercover agent.  Indeed, the CI received $3,950, including $500 in expenses after this incident.  Furthermore, the CI admitted that he has a memory disorder due to his multiple sclerosis.  Finally, the CI has been convicted of three felonies, although he never worked with law enforcement during his incarceration.  Thus, the court, having evaluated the credibility and motivation of each witness, determines that McMahon sent the pictures to the CI upon request and not of his own volition.

6.      The parties agree that <u>Navajo Nation v. United States Forest Service</u>, 479 F.3d 1024 (9th Cir. 2007), <u>rehearing en banc granted</u>, 506 F.3d 717 (9th Cir. 2007), correctly holds that the RFRA protects any exercise of religion, whether or not central to a system of religious belief.  While the court agrees with the holding, it declines to cite to the same as per the Ninth Circuit's order.  <u>See</u> 506 F.3d 717 ("The three-judge panel opinion shall not be cited as precedent by or to this court or any district court of the Ninth Circuit, except to the extent adopted by the en banc court.").