United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | No. CR 04-00317 MHP |
| Plaintiff, | |
| v. | **OPINION** |
| CHARLES EDWARD LEPP, | **Re: RFRA Motion in Limine** |
| Defendant. | |

This criminal action arises from an August 18, 2004 search of defendant Lepp's property, during which 24,784 marijuana plants were found on Lepp's property. Currently, Lepp is scheduled for trial on two counts—manufacturing and possessing marijuana with the intent to distribute and conspiracy to possess with intent to distribute marijuana. See 21 U.S.C. §§ 841(a)(1), 846. Lepp now moves this court, in limine, to allow him to present a defense at trial based on his religious beliefs. The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND

Defendant Charles Edward Lepp testifies that he is a practicing Rastafarian and minister of the Rastafarian faith. See Motion, Exh. A (hereinafter "Lepp Dec."), ¶¶ 2–3. He has been a Rastafarian and Christian since the year 2000. Id., ¶ 3. Concurrently, in 2000 and 2001, Lepp received honorary degrees from the Universal Life Church. See Motion, Exh. B to Exh. A (honorary doctor of divinity degree, doctor of metaphysics degree, doctor of religious humanities degree and credentials of ministry, all from the Universal Life Church).

1   Further, Lepp avers that he is a minister at the institution he founded, namely "Eddy's
2   Medicinal Gardens and Multi-Denominational Ministry of Cannabis and Rastafari Ministry." Lepp
3   Dec., ¶ 3. On May 10, 2004 "Eddy's Medicinal Gardens and Multi-Denominational Ministry of
4   Cannabis and Rastafari" received a corporate charter from the State of Nevada. See Motion, Exh. A
5   to Exh. A.

6   In adherence to his Rastafari faith, Lepp consumes marijuana as a sacrament. Lepp Dec., ¶ 6.
7   Lepp claims the use of this sacrament is essential, necessary and central to the exercise and practice
8   of his faith. Id. In support, Lepp presents a declaration by Dr. Noel Erskine, an associate professor
9   of Theology and Ethics at Emory University's Candler School of Theology. Motion, Exh. B,
10  ¶¶ 1–3. Erskine's research encompasses Rastafarianism and he has published books on this subject.
11  Id., ¶¶ 7–8. He states that Rastafari, a de-centralized religion, focuses on the importance of respect
12  and dignity for all human beings and for all living creatures. Id., ¶¶ 12–13. He claims that although
13  there are basic tenets to Rastafari, "individual Rastafari develop their own relations with and
14  interpretation of God and Rastafari." Id., ¶ 13. Further, "[t]he use of cannabis is considered a
15  sacramental act, a holy communion with God. . . . Often [Rastafari] share Ganja and farm and
16  harvest ganja together. The growing and harvesting of marijuana is integral to the practice of
17  Rastafari faith." Id., ¶¶ 14–15. Finally, Erskine testifies that "[i]t is consistent with the tenets of
18  Rastafari for a leader to make efforts to ensure that fellow practitioners of the faith have access to
19  the cannabis necessary for sacramental use." Id., ¶ 17.

LEGAL STANDARD

I.   Religious Freedom Restoration Act

The Religious Freedom Restoration Act ("RFRA") was enacted by Congress in 1993 as a response to the Supreme Court's decision in Employment Div., Dept. of Human Resources v. Smith, 494 U.S. 872 (1990), which had held that the government need not show a compelling interest in enforcing generally applicable laws that substantially burden a religious practice. See City of Boerne v. Flores, 521 U.S. 507, 513 (1997) ("Congress enacted RFRA in direct response to the Court's decision in [Smith]."). "In essence, RFRA re-establishes the Sherbert standard that the U.S.

2

Supreme Court supplanted in Smith." Guam v. Guerrero, 290 F.3d 1210, 1218 (9th Cir. 2002). Indeed, when Congress enacted RFRA, it stated its purpose as:

> [T]o restore the compelling interest test as set forth in Sherbert v. Verner . . . and to guarantee its application in all cases where free exercise of religion is substantially burdened; and . . . to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b). RFRA, however is purely statutory, and eschews any interpretation of the Free Exercise Clause itself. See id. § 2000bb-4; U.S. Const. Amend. I. Consequently, any argument regarding the continued applicability of the Smith standard is without merit.

RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). To establish a prima facie case, the movant "must show that the statute at issue works a substantial burden on his ability to freely practice his religion." Guerrero, 290 F.3d at 1222. If the law does create a substantial burden, the court may still uphold it if it meets the following exception:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person–
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(b). RFRA, therefore, "makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress." Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal (hereinafter "O Centro"), 546 U.S. 418, 434 (2006).

RFRA, however, has had its troubles in court. The Supreme Court declared RFRA unconstitutional as applied to the states because Congress exceeded its remedial authority under section five of the Fourteenth Amendment. City of Boerne, 521 U.S. at 532. The Court, however, left open the possibility that RFRA still applied to the federal government. Id. at 516. Thereafter, only three circuits, including the Ninth Circuit, have upheld RFRA's constitutionality as applied to the federal government. See Guerrero, 290 F.3d at 1221 (the Ninth Circuit "now join[s] our sister circuits in holding RFRA constitutional as applied in the federal realm"); Kikumura v. Hurley, 242 F.3d 950 (10th Cir. 2001) (holding that a plaintiff had a "substantial likelihood" of success in proving that a prison warden's denial of a pastoral visit violated RFRA); Christians v. Crystal Evangelical Free Church (In re Young), 141 F.3d 854 (8th Cir. 1998) (ruling that RFRA prevents the

3

1  recovery of a debtor's religious tithes as "avoidable transactions" in bankruptcy proceedings). But
2  see La Voz Radio de la Communidad v. Fed. Commc'n. Comm'n, 223 F.3d 313, 319 (6th Cir. 2000)
3  (expressing "doubt" that RFRA is still constitutional as applied to federal law). Nevertheless,
4  RFRA, as applied against the federal government, is good law in this Circuit.

The Ninth Circuit has found that RFRA "provides a level of protection to religious exercise beyond that which the First Amendment requires." Guerrero, 290 F.3d at 1218. Consequently, if Lepp's claims fail under RFRA, the court need not address his First Amendment arguments.[1]

## II. The Ninth Circuit on Rastafarianism

The Ninth Circuit has discussed the interplay of Rastafarianism with federal marijuana laws on two occasions. In United States v. Bauer, 84 F.3d 1549 (9th Cir. 1996), the Ninth Circuit reversed the district court's in limine decision to preclude defendants from presenting evidence that they used marijuana for religious purposes. The court did not take issue with defendants' assertion that "Rastafarianism is a recognized religion" and that "[s]tandard descriptions of the religion emphasize the use of marijuana in cultic ceremonies designed to bring the believer closer to the divinity and to enhance unity among believers. Functionally, marijuana—known as ganja in the language of the religion—operates as a sacrament with the power to raise the partakers above the mundane and to enhance their spiritual unity." Id. at 1556.

The Ninth Circuit found that drug laws criminalizing "simple possession" of marijuana implicated RFRA. Id. at 1559. The court went on to hold that:

> [Defendants] may be retried on the possession counts. The government should be free to cross-examine them on whether they, in fact, are Rastafarians and to introduce evidence negating their asserted claims. It is not enough in order to enjoy the protections of the Religious Freedom Restoration Act to claim the name of a religion as a protective cloak. Neither the government nor the court has to accept the defendants' mere say-so. The court may conduct a preliminary hearing in which the defendants will have the obligation of showing that they are in fact Rastafarians and that the use of marijuana is a part of the religious practice of Rastafarians.

Id. Once defendants were able to demonstrate their sincere beliefs,

> the government had the obligation, first, to show that the application of the marijuana laws to the defendants was in furtherance of a compelling governmental interest and, second, to show that the application of these laws *to these defendants* was the least restrictive means of furthering that compelling governmental interest.

4

Id. (emphasis added). Before remanding to the district court, the Ninth Circuit held that "[a]s to the counts relating to conspiracy to distribute, possession with intent to distribute, and money laundering, the religious freedom of the defendants was not invaded. Nothing before us suggests that Rastafarianism would require this conduct. These counts stand." Id.

The Ninth Circuit revisited this issue in Guam v. Guerrero, 290 F.3d 1210 (9th Cir. 2002). There, the court did not take issue with the Superior Court of Guam's findings, which the government did not dispute, that "Rastafarianism is a legitimate religion of which Guerrero is a legitimate member. . . . [M]arijuana use is sacramental in the practice of that religion." Id. at 1212–13 (citations omitted). The court then relied upon Bauer to find that *importation* of marijuana was not required by Rastafarianism. Id. at 1223. Consequently, the court rejected defendant's RFRA defense because laws against importation of marijuana did not substantially burden the right to practice Rastafarianism.

DISCUSSION

I.     Substantial Burden

RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). To establish a prima facie case, Lepp must show that "application of the Controlled Substances Act would (1) substantially burden (2) a sincere (3) religious exercise." O Centro, 546 U.S. at 1219 (Supreme Court adopting the standard set forth by the district court). In the Ninth Circuit, a court must determine: 1) the precise scope of defendant's beliefs; 2) whether defendant's beliefs are religious; 3) whether defendant's beliefs are sincerely held; and 4) whether defendant's exercise of religion will be substantially burdened by the statute. United States v. Zimmerman, 514 F.3d 851, 854 (9th Cir. 2007). Here, the first and second prongs of Zimmerman are co-extensive with the third prong specified in O Centro. The other prongs are identical.

The prosecution concedes that Rastafarianism is a bona fide religion. Opposition at 5. This concession allows the court to avoid the undesirable task of determining what set of beliefs constitute a religion. In United States v. Meyers, 95 F.3d 1475 (10th Cir. 1996), the defendant

5

1  claimed to be "the founder and Reverend of the Church of Marijuana and that it [was] his sincere
2  belief that his religion command[ed] him to use, possess, grow and distribute marijuana for the good
3  of mankind and planet earth." Id. at 1479. The court held that the defendant's beliefs were
4  sincerely held, but they were not "religious beliefs," rather a philosophy or way of life. Id. at 1484.
5  The court examined the elusive, ethereal, personal and metaphysical question of "what is religion."
6  Id. at 1482. It then analyzed the following factors: 1) ultimate ideas; 2) metaphysical beliefs;
7  3) moral or ethical systems; 4) comprehensiveness of beliefs; and 5) accoutrements of religion. Id.
8  at 1483–84. This court declines any invitation to define religion because "[t]he ability to define
9  religion is the power to deny freedom of religion." Id. at 1489 (Brorby, J., dissenting).

10  The prosecution, however, questions whether Lepp himself is a bona fide Rastafarian.
11  Specifically, the prosecution questions his sincerity. The Ninth Circuit has held that it is the
12  defendant's obligation to show the tenets of his religion as well as his adherence to those tenets.
13  Bauer, 84 F.3d at 1559 ("defendants . . . have the obligation of showing that they are in fact
14  Rastafarians and that the use of marijuana is a part of the religious practice of Rastafarians."). Here,
15  Lepp testifies that he is a sincerely practicing Rastafarian. Lepp Dec., ¶ 2. Lepp claims to have
16  been openly practicing Rastafari since the year 2000. Id., ¶ 3. He presents documentary evidence
17  demonstrating honorary and actual accreditations he has received from the Universal Life Church,
18  which purport to make him fit to be a Rastafari minister. Motion, Exh. B to Exh. A. He also
19  presents evidence that he incorporated "Eddy's Medicinal Gardens and Ministry of Cannabis and
20  Rastafari" before the search that led to this prosecution. Motion, Exh. A to Exh. A.

21  The court is mindful of the direction provided in Zimmerman, which states that "[t]he district
22  court should hear directly from [defendant], as his credibility and demeanor will bear heavily on
23  whether his beliefs are sincerely held." 514 F.3d at 854. Indeed, there are numerous facts that cast
24  doubt upon Lepp's sincerity. For instance, the court is aware of Lepp's initial medical marijuana
25  defense, which he has abandoned in light of Gonzales v. Raich, 545 U.S. 1 (2005). Though Lepp
26  has asserted RFRA in other filings in this district, no RFRA assertions seem to have been made until
27  the institution of the instant proceedings. Compare Lepp v. Kelly, No. C 02-5901 VRW (N.D. Cal.,
28  filed 2002), Docket No. 1 (Lepp's complaint asking for return of his medical marijuana) with Lepp

6

1  v. Gonzales, No. C 05-0566 VRW (N.D. Cal., filed 2005), Docket No. 1 (Lepp's complaint alleging
2  a RFRA violation). It is telling that Lepp incorporated "Eddy's Medicinal Gardens *and* Ministry of
3  Cannabis and Rastafari." (emphasis added). Lepp seems to have anticipated both these defenses
4  when he applied for incorporation. In addition, Lepp's ministry credentials are suspect. The
5  "Universal Life Church," from which Lepp received his credentials, is not a seminary or religious
6  body; it is a credential mill and each of the credentials Lepp claims can either be purchased on-line
7  or obtained free. Specifically, the Church states that anyone can be ordained a minister immediately
8  and free of charge, without having to go through the pre-ordination process required by other
9  religious faiths. See Universal Life Church, http://www.ulc.net/.

10  The simple fact that Lepp was caught with almost 25,000 plants of marijuana also undercuts
11  his assertions of sincerity. There is no evidence that this amount of marijuana was required for the
12  sacramental needs of Lepp and his parishioners. Further, Lepp's own testimony indicates that
13  according to his beliefs, Rastafarianism allows a wide range of behavior. Lepp does not, however,
14  distinguish between required activities and merely acceptable activities. See Sept. 16, 2005 Hearing
15  Transcript, Docket No. 215 at 51:19–24 (Rastafarian ceremonies "could be as simple as even just
16  one person sitting their [sic] quietly alone and smoking a joint and communing with God or two
17  people sitting there and doing that. It could involve four or five thousand people in a drum circle
18  and virtually just about everything in between."). Nevertheless, in light of the court's eventual
19  holding, the court declines to conduct a preliminary hearing on this matter. Thus, the court
20  expressly assumes, without finding, for purposes of this order only, that Lepp's adherence to
21  Rastafarianism is sincere.

22  The prosecution next argues that the only counts Lepp faces—manufacturing and possessing
23  marijuana with the intent to distribute and conspiracy to possess with intent to distribute
24  marijuana—are not tenets of the Rastafari religion. The Ninth Circuit has "acknowledged that
25  Rastafarianism is a legitimate religion, in which marijuana plays a necessary and central role."
26  Guerrero, 290 F.3d at 1213 (citing Bauer, 84 F.3d at 1556). In Bauer, the Ninth Circuit found that
27  RFRA could not be used as a defense to: 1) conspiracy to distribute; 2) possession with intent to
28  distribute; and 3) money laundering because "the religious freedom of the defendants was not

7

invaded. *Nothing before [the Ninth Circuit] suggest[ed] that Rastafarianism would require this conduct.*" Bauer, 84 F.3d at 1559 (emphasis added). This does not foreclose the possibility that the Ninth Circuit would have ruled similarly if it heard evidence demonstrating that distribution or the like is required by Rastafarianism.

The situation here is distinguishable. Lepp has presented evidence from a professor of theology at Emory University that "[o]ften [Rastafari] share Ganja and farm and harvest ganja together. The growing and harvesting of marijuana is integral to the practice of Rastafari faith." Motion, Exh. B, ¶¶ 14–15. Furthermore, the professor contends that "[i]t is consistent with the tenets of Rastafari for a leader to make efforts to ensure that fellow practitioners of the faith have access to the cannabis necessary for sacramental use." Id., ¶ 17. The prosecution presents no contradictory factual evidence whatsoever. Consequently, the court is left with no option but to hold that the activities criminalized by the counts with which Lepp is charged—manufacturing and possessing marijuana with the intent to distribute and conspiracy to possess with intent to distribute marijuana—are tenets of the Rastafari religion. This finding, along with Lepp's statement that "[t]he sacramental use of [marijuana] in ceremonies is used to bring me and my ministry closer to the divinity and to enhance unity among believers," Lepp Dec., ¶ 6, meet both prongs one and two of the Zimmerman test set forth above.[2]

Finally, the court reaches the issue of "substantial burden." The Ninth Circuit has set forth the standard very clearly:

> A statute burdens the free exercise of religion if it 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs,' Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), including when, if enforced, it 'results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution.' Braunfeld v. Brown, 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). A substantial burden must be more than an 'inconvenience.' Worldwide Church, 227 F.3d at 1121.

Guerrero, 290 F.3d at 1222. Lepp contends that the Controlled Substances Act ("CSA") substantially burdens his ability to practice his religion by criminalizing the possession and distribution of marijuana. To the extent that Lepp's description of the tenets of Rastafarianism is true, the court concludes Lepp has made a prima facie showing that the CSA substantially burdens his ability to practice his religion. By criminalizing the possession, manufacture, distribution and

8

1 use of any non-zero amount of marijuana, the CSA forces Lepp to choose between "'abandoning his
2 religious principle or facing criminal prosecution.'" Id. (quoting Braunfeld, 366 U.S. at 599).

3 Based on evidence presented and certain assumptions made by this court, Lepp has made a
4 prima facie showing of substantial burden. The burden now shifts to the prosecution to demonstrate
5 that the federal government has a compelling interest in the CSA and that the least restrictive means
6 have been used to effectuate that interest.

## II.      Compelling Interest

The Supreme Court's most recent pronouncement on this issue comes by way of Chief Justice John Roberts' unanimous opinion in O Centro, 546 U.S. 418, issued in 2006. In O Centro, plaintiffs were American members of a Christian sect based in Brazil, and a tenet of their faith was the receipt of "communion through hoasca (pronounced 'wass-ca'), a sacramental tea made from two plants unique to the amazon region." Id. at 425. One of the plants contained dimethyltryptamine ("DMT"), a hallucinogen "listed in Schedule I of the Controlled Substances Act." Id. After United States Customs officials intercepted a shipment of hoasca destined for plaintiffs, plaintiffs filed suit alleging "that applying the Controlled Substances Act to the [sect's] sacramental use of hoasca violates RFRA." Id. at 425–26. Plaintiffs successfully moved the district court for a preliminary injunction so they could practice their faith pending trial. Id. at 426. Like the Court of Appeals before it, the Supreme Court also upheld the preliminary injunction issued by the district court.

It is the prosecution's burden to demonstrate a compelling interest. "The term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3). Thus, the prosecution must "demonstrate[] that the application of the burden to the [defendant] would, more likely than not, be justified by the asserted compelling interests." O Centro, 546 U.S. at 428.

The government advanced "three compelling governmental interests: protecting the health and safety of the sect's members, preventing the diversion of hoasca from the church to recreational users, and complying with the 1971 United Nations Convention on Psychotropic Substances, a treaty

9

1  signed by the United States and implemented by the Act." Id. at 426. In addition to other

2  arguments, the Supreme Court rejected all three of these arguments.[3]

3       O Centro rejected the first two arguments because "[t]he District Court [had] concluded that

4  the evidence on health risks was 'in equipoise' and similarly that the evidence on diversion was

5  'virtually balanced.'" Id. (quoting the district court opinion). The Supreme Court held that "the

6  burdens at the preliminary injunction stage track the burdens at trial," and the "Government failed to

7  demonstrate that the application of the burden to the [sect] would, more likely than not, by justified

8  by the asserted compelling interest." Id. at 428–29.

9       Furthermore, in O Centro the "Government's central submission [was] that it has a

10 compelling interest in the uniform application of the Controlled Substances Act, such that no

11 exception to the ban on use of the hallucinogen can be made to accommodate the sect's sincere

12 religious practice." 546 U.S. at 423. The Court held that "RFRA requires the Government to

13 demonstrate that the compelling interest test is satisfied through application of the challenged law

14 'to the person'—the particular claimant whose sincere exercise of religion is being substantially

15 burdened." 546 U.S. at 430–31 (quoting 42 U.S.C. § 2000bb-2(3)). The Court went on to hold that

16 "[u]nder the more focused inquiry required by RFRA and the compelling interest test, the

17 Government's mere invocation of the general characteristics of Schedule I substances, as set forth in

18 the Controlled Substances Act, cannot carry the day." Id. at 432.

19      With the pronouncements of O Centro in mind, the court now determines whether the

20 prosecution has demonstrated a compelling federal interest.

21      1.     Dangerousness of Marijuana

22      The prosecution advances the argument that the dangerousness of marijuana creates a

23 compelling governmental interest in regulating it. Indeed, "[e]very federal court that has considered

24 the matter, so far as we are aware, has accepted the congressional determination that marijuana in

25 fact poses a real threat to individual health and social welfare." Olsen v. Drug Enforcement Agency,

26 878 F.2d 1458, 1462 (D.C. Cir. 1989). More recently, the Seventh Circuit found that "there is ample

27 medical evidence establishing the fact that the excessive use of marijuana often times leads to the

28 use of stronger drugs such as heroin and crack cocaine." United States v. Israel, 317 F.3d 768 (7th

10

1  Cir. 2003). This argument was accepted by Judge Walker in a prior civil case brought forth by

2  Lepp. Judge Walker stated:

> Congress undoubtedly believes marijuana has a 'substantial and detrimental effect on the health and general welfare of the American people.' 21 USC 801(2) ('Congressional findings and declarations; controlled substances'). In light of Congress' findings, courts, both pre and post-RFRA, have held that Congress has a compelling interest in preventing the abuse of marijuana, despite the burden this regulation places on religion. See Israel, 317 F3d at 771 (concluding that, under RFRA, Congress has a compelling interest in regulating marijuana because 'there is ample medical evidence establishing the fact that the excessive use of marijuana often times leads to the use of stronger drugs such as heroin and crack cocaine.' (citation omitted); United States v Brown, 1995 US App LEXIS 34750, *5 (8th Cir 1995) ('We have recognized that the government has a compelling state interest in controlling the use of marijuana.' (citation omitted)); United States v Rush, 738 F2d 497, 512-513 (1st Cir 1984) (recognizing the 'overriding governmental interest in regulating marijuana.'); Leary v United States, 383 F2d 851, 861 (5th Cir 1967) ('It would be difficult to imagine the harm which would result if the criminal statutes against marihuana were nullified as to those who claim the right to posses and traffic in this drug for religious purposes.'). Like the courts cited above, this court may not second-guess Congress' conclusion that marijuana presents a compelling threat to individual health and social welfare. See Rush, 738 F2d at 512 ('Congress has weighed the evidence [regarding the regulation of marijuana] and reached a conclusion which it is not this court's task to review *de novo*.').

14  Lepp v. Gonzales, No. C 05-0566 VRW (N.D. Cal. Aug. 2, 2005), Docket No. 46 at 19–20 (order

15  dismissing case). The court rejects this entire line of reasoning for two reasons. First, the

16  prosecution has not demonstrated the dangerousness of marijuana; and second, even if the

17  dangerousness of marijuana were demonstrated, the same, standing alone, is insufficient to be a

18  compelling interest.

19  First, more recent research disputes the characterization that marijuana as dangerous. Dr.

20  Lester Grinspoon, a professor emeritus at Harvard Medical School states that "cannabis is

21  remarkably safe. Although not harmless, it is surely less toxic than most of the conventional

22  medicines it would replace if it were legally available." Lepp's Supp. Mot., Exh D, ¶ 8. He goes on

23  to state that "cannabis has never caused an overdose death" and "[d]uring the past few years, the

24  medical uses of cannabis have become increasingly clear to many physicians." Id. Dr. David

25  Bearman, the former director of the Haight Ashbury Drug Treatment Program, testifies that "[i]t is a

26  well-documented fact that once a cannabis consumer decides to give it up . . . that almost all do so

27  with no or little difficulty." Id., Exh B at 5.

28

11

Some researchers have also found that marijuana has medicinal uses. In the May 2008 issue of the *Journal of Pain*, "UC Davis researchers found that inhaled marijuana provided pain relief to . . . patients" suffering from spinal-cord injuries, multiple sclerosis and other nerve injuries. Id., Exh A at 2. Marijuana has also been shown to alleviate symptoms of cancer chemotherapy, osteoarthritis, glaucoma, AIDS and depression. Id., Exh. D, ¶ 17. These findings led the American College of Physicians, representing over 124,000 doctors, to release a position paper "calling for legal protection for medical marijuana users and reconsideration of marijuana's Federal classification as a Schedule 1 drug." Id., Exh A at 2; see also Gonzales v. Raich, 545 U.S. 1, 28 n.37 (2005) ("We acknowledge that evidence proffered by respondents in this case regarding the effective medical uses for marijuana, if found credible after trial, would cast serious doubt on the accuracy of the findings that require marijuana to be listed in Schedule I.").

The court finds that Lepp's showing, within the backdrop of Congressional findings, renders the evidence on the potential dangers of marijuana in equipoise. As a result, the dangerousness of marijuana has not been demonstrated by a preponderance of the evidence, as required by O Centro. 546 U.S. at 426. In any event, even if the dangerousness of marijuana were undoubtedly established, the prosecution cannot meet its burden through this argument.

This entire line of reasoning, based on the extreme dangerousness of a controlled substance, has been rejected by the Supreme Court. Specifically, the deference that the pre-Smith line of cases give to Congressional classification of marijuana as an illegal substance has been conclusively undermined by the Supreme Court. In O Centro, the Court held:

> Under the more focused inquiry required by RFRA and the compelling interest test, the Government's mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the day. It is true, of course, that Schedule I substances such as DMT are exceptionally dangerous. See, e.g., Touby v. United States, 500 U.S. 160, 162, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991). Nevertheless, there is no indication that Congress, in classifying DMT, considered the harms posed by the particular use at issue here—the circumscribed, sacramental use of *hoasca* by the [sect]. The question of the harms from the sacramental use of *hoasca* by the [sect] *was* litigated below. Before the District Court found that the Government had not carried its burden of showing a compelling interest in preventing such harms, the court noted that it could not 'ignore that the legislative branch of the government elected to place materials containing DMT in Schedule I of the [Act], reflecting findings that substances containing DMT have 'a high potential for abuse,' and 'no currently accepted medical use in treatment in the United States,' and that '[t]here is a lack of accepted safety for use of [DMT] under medical supervision.' ' 282 F.Supp.2d, at 1254. But Congress' determination that

12

DMT should be listed under Schedule I simply does not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA.

546 U.S. at 432. The case at bar is indistinguishable. The prosecution's categorical argument based on the dangerousness of marijuana is insufficient to carry the day. Indeed, the Ninth Circuit reversed Judge Walker's decision in the above-cited Lepp v. Gonzales, which accepted this argument, because it conflicted with the after-decided O Centro. See Lepp v. Gonzales, No. C 05-0566 VRW (N.D. Cal. Mar. 9, 2008), Docket No. 59 at 2 (Ninth Circuit reversing Judge Walker's compelling interest analysis but affirming on other grounds).

        2.        Application of Criminal Laws

Second, the prosecution argues that it has a compelling interest in the enforcement of the federal controlled substance laws because "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2); see also id. § 841(b) (providing severe penalties for violations of marijuana laws). It states that since the United States is a party to international treaties and conventions designed to control international drug trafficking, see 21 U.S.C. § 841(7), the prosecution's interest in enforcing its criminal laws, especially its drug laws, is of the highest order. This argument has been conclusively rejected above. The court also notes that this line of reasoning is circular. The prosecution is, in effect, arguing that the compelling interest it has in the enforcement of its laws is the enforcement of its laws.

The prosecution also argues, albeit when referring to the least restrictive means prong, that criminal laws must be obeyed universally. The *uniform* application of criminal laws argument, as a compelling interest, has also been soundly rejected by the Supreme Court. Specifically:

> The well-established peyote exception also fatally undermines the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA. The Government argues that the effectiveness of the Controlled Substances Act will be 'necessarily . . . undercut' if the Act is not uniformly applied, without regard to burdens on religious exercise. Brief for Petitioners 18. The peyote exception, however, has been in place since the outset of the Controlled Substances Act, and there is no evidence that it has 'undercut' the Government's ability to enforce the ban on peyote use by non-Indians.

O Centro, 546 U.S. at 434–35. The Court did hold, however, that the "Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that

13

1 granting the requested religious accommodations would seriously compromise its ability to
2 administer the program." Id. at 435.

### 3. Diversion

There is ample evidence here that "granting the requested religious accommodations would seriously compromise [the government's] ability to administer the [CSA]." Id. Specifically, the potential for diversion here threatens to undermine the entire Controlled Substances Act and enforcement thereof.

O Centro can be distinguished on the facts. The Supreme Court agreed with the district court's finding that the "evidence on diversion was virtually balanced." Id. at 426 (quotation omitted). The Court emphasized that "thinness of any market for hoasca, the relatively small amounts of the substance imported by the church, and the absence of any diversion problem in the past." Id. The situation here is dissimilar. Indeed, the market for marijuana is anything but thin, the amount of marijuana that Lepp possessed, almost 25,000 plants covering several acres, is certainly not a small amount and there is ample evidence of diversion.

In light of the vast quantity of marijuana seized, the potential for diversion of this marijuana to non-adherents is very high. This interest—disallowing the diversion of Schedule I controlled substances away from permissible religious uses—is a compelling governmental interest. See Multi Denominational Ministry of Cannabis & Rastafari v. Mukasey, No. C 06-4264 VRW, 2008 WL 914448 (N.D. Cal. Mar. 21, 2006) (Walker, J). In Multi Denominational Ministry, Judge Walker dismissed an action brought by Lepp's church. He found that, when tens of thousands of marijuana plants were implicated, the need for uniformity precluded any exceptions to generally applicable criminal laws because of the high threat of diversion. Id., at *5. Likewise, the evidence here demonstrates that it is far more likely than not that the marijuana seized could have been diverted to non-adherents.

The mass quantities of marijuana in Lepp's possession allows him to distribute the same to thousands of people. Further, Lepp openly claims to be a practicing Rastafarian and has signs on the perimeter of his property informing others that marijuana is grown on his property. Knowledge within the community that Lepp openly possesses great amounts of a controlled substance would

14

greatly undermine law enforcement's ability to keep marijuana out of the hands of non-adherents. This potential is exacerbated by the fact that the marijuana was growing on Lepp's land in plain view from the highway with no barriers to access. See Docket No. 207 at 5–9. Indeed, law enforcement officers simply walked on to Lepp's property to access the marijuana. Any non-Rastafarian member of the public could also have done so easily. Finally, Lepp himself could be causing the diversion. In this prosecution, he is also charged with the sale of one pound of marijuana to an undercover agent. See id. at 17–23. Consequently, a compelling governmental interest in regulating against *this* defendant has been shown.

III.     Least Restrictive Means

The prosecution cites to pre-Smith cases in support of its proposition that a blanket prohibition on marijuana is the least restrictive means available. See Olsen, 878 F.2d at 1462. The facts in Olsen are similar:

> Petitioner Olsen [was] a member and priest of the Ethiopian Zion Coptic Church. While the church is alleged to have several thousand members in Jamaica, it has never had more than between 100 and 200 members in the United States. Olsen asserts, and the government concedes for purposes of this case, that the church's sacrament is marijuana; under church teachings, marijuana is combined with tobacco and smoked 'continually all day, through church services, through everything we do.'

Id. at 1459 (citing petitioner's testimony). When evaluating this case for a violation of the First Amendment, then-judge Ginsburg of the D.C. Circuit held:

> The pivotal issue, therefore, is whether marijuana usage by Olsen and other members of his church can be accommodated without undue interference with the government's interest in controlling the drug. Three circuits have so far considered pleas for religious exemption from the marijuana laws; each has rejected the argument that accommodation to sacramental use of the drug is feasible and therefore required. Rush, 738 F.2d at 513 (First Circuit); Olsen v. Iowa, 808 F.2d at 653 (Eighth Circuit); Middleton, 690 F.2d at 825 (Eleventh Circuit). We have no reason to doubt that these courts have accurately gauged the Highest Court's pathmarks in this area.

Id. at 1462. Based on the above, the court held that a marijuana exception would unduly interfere with the governmental interest. This case is inapposite because the "undue interference" standard is simply not the standard under RFRA.

Lepp argues that the current statutory scheme, with no exceptions, is not the least restrictive means to further the governmental interest. Specifically, he argues that permit processes are

15

currently being successfully used, and that there is no reason the government cannot establish an exemption which meets its purposes of enforcing drug statutes, but does not burden the legitimate religious expression of Lepp and his church. See, e.g., United States v. Antoine, 318 F.3d 919, 920 (9th Cir. 2003) (statutory scheme that generally prohibits possession of bald and golden eagles includes a permit process that exempts possession for religious purposes).

The court must analyze this argument on a defendant-specific basis. See Bauer, 84 F.3d at 1559 (requiring government to prove that "application of these laws to *these defendants* was the least restrictive means of furthering that compelling governmental interest." (emphasis added)). A reviewing court must "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." O Centro, 546 U.S. at 431. When performing this scrutiny, the court must analyze the effect of a religious exemption as if it would apply to Lepp and all other Rastafarians. United States v. Adeyemo, No. CR 03-40200 MJJ, 2008 WL 928546, at *11 n.11 (N.D. Cal April 4, 2008) (Jenkins, J.); see O Centro, 546 U.S. at 430–31.

Olsen is persuasive here because of its discussion regarding the scale of marijuana usage in the United States. Specifically, it states:

> [T]he actual abuse and availability of marijuana in the United States is many times more pervasive . . . than that of peyote . . . . The amount of peyote seized and analyzed by the DEA between 1980 and 1987 was 19.4 pounds. The amount of marijuana seized and analyzed by the DEA between 1980 and 1987 was 15,302,468.7 pounds. This overwhelming difference explains why an accommodation can be made for a religious organization which uses peyote in circumscribed ceremonies, and not for a religion which espouses continual use of marijuana.

Id. at 1463. That court then rested its decision in part "on the immensity of the marijuana control problem in the United States." Id. at 1464. Similarly, here, in light of evidence of actual diversion, the court is convinced that the least restrictive means to circumvent the diversion of mass quantities of marijuana to non-adherents of Rastafarianism is a blanket rule criminalizing large quantities of marijuana. Although the court does not reach the question of the amount of marijuana that would *not* raise diversion concerns, the court concludes that the quantity in question here, approximately 25,000 marijuana plants, is sufficient enough to warrant a blanket rule with no exceptions.

The court notes two further aspects of its ruling. Lepp has made no showing that the size of his congregation warrants the possession of this large number of marijuana plants. Though unlikely,

16

hypothetically there might be a situation where this amount of marijuana could be necessary to provide for a mega-church.[4]  Indeed, the Supreme Court has said as much:

> We do not doubt that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA. But it would have been surprising to find that this was such a case, given the longstanding exemption from the Controlled Substances Act for religious use of peyote, and the fact that the very reason Congress enacted RFRA was to respond to a decision denying a claimed right to sacramental use of a controlled substance. See 42 U.S.C. § 2000bb(a)(4).

O Centro, 546 U.S. at 436–437.  Concerns about diversion would still exist, however, even if large quantities of this popular Schedule I drug were all meant for religious purposes.  Indeed, there has been no showing here of how Lepp and his congregation would restrict or that they have restricted access to the marijuana to sincere Rastafarians only.

Second, this ruling is entirely consistent with O Centro, which can be distinguished on the facts based upon the quantity in possession.  There, only three drums of hoasca were implicated,[5] 546 U.S. at 425, which is a far cry from the thousands of marijuana plants seized here.  Id. at 439 ("courts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular practice at issue.").  In order to remain consistent with O Centro, the court notes that its decision does not implicate charges of "mere possession" against Rastafarians.  Specifically, this opinion does not implicate prosecution of marijuana that is for purely personal use.  Possession of smaller amounts may eliminate the diversion concerns, and consequently, may eliminate the government's compelling interest in criminalizing possession of marijuana as applied to practicing Rastafarians.

CONCLUSION

For the foregoing reasons, defendant's motion in limine is DENIED.  Lepp may not present a RFRA defense at trial.

IT IS SO ORDERED.

Dated: August 14, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

17

**ENDNOTES**

1.	To the extent that Lepp asserts violations of his Fourteenth Amendment rights, those rights are implicated by states' actions, not federal action.

2.	This also meets the third prong specified in O Centro.

3.	The third argument is inapplicable here and therefore not discussed.

4.	During the hearing on this motion, Lepp argues for the first time that his church has 2,500 parishioners, that his land is divided by parishioner and that his parishioners are sharecroppers. No declaration to this effect was submitted before the hearing and the court refused to entertain this argument at the hearing since not only is it incredible, the delayed and opportunistic timing of these assertions also undercut Lepp's sincerity. Nevertheless, even if the court were to accept this assertion, Lepp would then need to demonstrate the sincerity of all 2,500 parishioners in order to allay the court's diversion concerns. Lepp would also have to show that ten plants per parishioner is required by the tenets of his faith. Further, this showing would still fail to address the court's concern about creating two standards: one for a minister and one for an adherent of any particular religion, especially considering that anybody may be ordained a minister immediately and effortlessly through the Universal Life Church.

5.	Lepp argues that fourteen prior shipments of hoasca had been delivered to the plaintiffs in O Centro. The action for an injunction, however, was brought by plaintiffs only when three drums of hoasca were confiscated. Lepp is attempting to improperly aggregate the prior use of hoasca by the plaintiffs. If the court were to accept this argument, the court would also have to aggregate all prior possession and use of marijuana by Lepp.